## Case No. 10,985.

PERKINS et al. v. CURRIER et al.

[3 Woodb. & M. 69.] [1]

Circuit Court, D. Maine. May Term, 1847.

PRINCIPAL AND AGENT—AGENT ADMITTING PARTNER—ASSENT OF PRINCIPAL—LEASE—LESSOR'S RIGHT—PARTNERSHIP.

1. Where a power of attorney is given to conduct all one's business at a particular place, and subsequently most of his property there is leased to the attorney for twenty years, this does not revoke the power, but modifies and limits it to the property and interest and business still retained by the principal.

2. Under a great necessity, the attorney may sell property, or admit partners to conduct such of the business as may be left in the principal; but if the principal assigns his interest in the lease and the leasehold property to his son, the attorney cannot, by virtue of the power, any longer dispose of that, or put it under the direction of new partners.

3. Nor can the attorney, as lessee, (when he is a brother, confided in, and covenants to carry on the business with the property leased for half the net profits,) allow others to possess any rights in that property, inconsistent with his contract, or put the business in charge of strangers, or alter the proportion of profits to be received by the lessor.

4. But if he does this, and the lessor or his assignee subsequently assent to it, the change is binding on them.

5. As between the original parties, however, it binds the lessor only to the terms and constructions of the new articles, stated by the lessee before the assent to be intended.

6. To that extent it will bind, though the representations as to the exigencies for a change were in some respects strong and of doubtful correctness, though not so clearly exaggerated as to amount to falsehood or fraud.

7. If doubts exist in such cases as to facts, from mere length of time, they operate against a complainant who has omitted for several years to institute legal proceedings and settle the difficulties while the facts are fresh. But if some of them are rendered questionable, by the neglect of the lessee to keep and return full accounts, this circumstance must operate unfavorably to him.

8. The assignee is entitled to a return of the articles at the end of the lease which the lessor originally furnished, or their full value at the end of the term, with interest, if they have not been worn out.

9. He has the same right to those purchased with the earnings before the new partnership; and to that portion which his interest covers in the company, of the value of the new tools, plates, materials and machinery, bought or made by the company, while the lessee was a partner in his behalf.

10. So, in proportion to his share, he has a right in what was due the lessee in 1833, as well as to the company in 1839, for work previously performed.

11. The partnership property is responsible for what is due to a partner retiring, and if not enough to satisfy the claim, each member is liable for the residue in a ratio with his interest.

[These were bills in equity by Angier M. Perkins and Jacob Perkins against Solomon H. Currier and Nathaniel Perkins, executors of Abraham Perkins, and the same plaintiffs against Hazen Morse, Isaac Cary, and Vistus Balch, in addition to the same defendants.]

They related to the same transaction, but the latter part of it, after 1833, included additional respondents. These last were proceeded against in a second bill. The substance of the allegations in both was, that in 1817, Jacob and Abraham Perkins were brothers, residing at Newburyport, Mass. That the former had invented the stereotype steel plates for engraving bank notes, and obtained a patent for the same, and also had procured a law to be passed by the state of Massachusetts, requiring the bank notes of that state to be printed thereon; and being about to remove to Philadelphia, to give his brother Abraham a general power of attorney to carry on his business. That in 1819, concluding to remove still further from Newburyport and remain some time in London in England, Jacob, on the 29th of May in that year, leased to Abraham all his plates and tools, valued then at $22,500, for the term of twenty years, the said Abraham agreeing to continue to conduct with them the business of bank note engraving, and account to said Jacob for half the net proceeds after deducting all necessary expenses. The said Abraham was also to keep regular accounts of the business, open to inspection, and to surrender the tools and plates at the end of the term in good repair. Thereupon, the business was afterwards conducted at Newburyport by Abraham, with large profits till 1833. Jacob in 1829 assigning all his interests to Angier March Perkins, his son, and giving due notice thereof to Abraham That Abraham neglected to keep and transmit accurate accounts, but till 1833 received large profits from the business and remitted to said Jacob or Angier near $25,000 in all, though not the whole, which as they believe was justly due, the whole profits having probably been from $10,000 to $12 000 yearly. The balance of the one-half, still claimed, is averred to have been demanded of the executors of Abraham, but not paid. The bills then averred, that about 1829, Nathaniel Perkins, the son of Abraham, was employed by him, and in 1831, desired to become a partner in the business, and receive a portion of its profits; but Angier declined the proposition, and thereupon Nathaniel, becoming dissatisfied, did, about the 12th of February, 1833, from a company

[1] [Reported by Charles L. Woodbury, Esq., and George Minot, Esq.]

for engraving bank notes, composed of himself, Abraham, Morse, &c. That, in violation of the lease and agreement with Jacob, the said Abraham then transferred to this company all the plates and tools, and improvements, of Jacob and Angier, and removed the business from Newburyport to Boston to be conducted, afterwards, there; and all this without the consent of said Jacob or Angier. That Abraham thus got Nathaniel interested as a partner with himself, and proposed to exclude Jacob and Angier, unless they consented to relinquish the former lease, and their rights under it, which did not expire till 1839.

It was further alleged, that the New England Bank Note Company, then formed, included, not only Nathaniel, and Abraham, and Morse, but Pendleton; and afterwards Cary and Balch, who all derived great advantages from the use of the plates and tools of Jacob, and his improvements and good will. That the company have thus realized $12,000 yearly, as profits, and after paying large salaries to each other, divided the residue among themselves, without regard to the rights of said Angier. That, living beyond seas, Angier was kept in ignorance of much of the matter by Abraham, and misled, and not furnished with proper accounts. About the time when the lease was to expire, in 1839, he therefore selected an agent to examine into the business, and report to him the facts, which being done in 1840, he protested against the whole, in writing. That Abraham had acted as agent of Jacob, in some other matters, and paid certain debts for him, and mingled erroneously those concerns with their mutual business, under the lease. And that Abraham, though requested, neglected to render his accounts in due form, and furnished none after 1829; though he afterwards remitted $11,000 in 1830, and about $10,000 between that and 1834, and some in 1838, but without suitable exhibits to show its application, and no money since, though often demanded. And that Abraham died, April 5th, 1839, and left large assets; and Currier and Nathaniel Perkins were his executors, and should have returned the plates, machinery and tools, but have neglected to do it. The bill prayed for answers to various interrogations, and an account for the sums received, and the expenses incurred, and a return of the property leased, or its value and interest, since 1839.

The second bill is confined, chiefly, to matters after the new company was formed, in 1833; and Pendleton was not included in it, because living in Pennsylvania the court would not possess jurisdiction over him. It charged a combination among them all, to defraud Angier by means of the new company, and that he never assented to the same, and is entitled to half the profits made by it; because, though the expenses were greater, yet the income was larger, and equalled at least, $12,000, yearly. It prayed

19FED.CAS.—16

a discovery of facts—an account—payment of dues, and delivery of tools and plates.

The answers of the respondents, though in fact, separate, were not unlike, so far as they related to the same matters. Those of the executors of Abraham admit the lease of 1819, as set out in the bill, but deny that the plates and tools were then worth $22,000, or in 1838, over $4,000. They admit that Jacob had obtained a patent for the stereotype steel plates, discovered by him, but aver that it had expired before 1819, and the improvements by Jacob had then ceased to be a secret. That his patent to suppress counterfeits, by small letters and words, expired in 1824, and the law he obtained from the state of Massachusetts against the use of bank notes, except those engraved by stereotype plates, did not prohibit others than Jacob from making such plates, and was repealed entirely in 1836. They admitted Jacob's experience and skill in this business, and that the plates were not easily counterfeited, but averred that they were little used out of New England. They admit that Abraham was agent of Jacob for the two years before the lease, but denied any procurement from him of valuable secrets, he having made public all his modes of engraving, and Abraham having become acquainted with them as a workman and agent, and not in confidence. They also admit the business, from 1819 to 1833, to have been profitable in some years, but insist it was a loss in others —the average income not exceeding $4,850 yearly. They admit, further, that the assignment was duly made to Angier, and they notified, as alleged. They admit that Nathaniel applied, without success, to become a partner, but deny that Jacob and Abraham were partners. They admit that Nathaniel had been well educated, with Jacob and Angier, in London, and with Abraham, at Newburyport; that Morse was a hired man at the latter place, and not Pendleton; and knew the business to be lucrative, as did Nathaniel.

They further averred, that in 1831-2, the stereotype notes became counterfeited extensively, and hence an effort was made to repeal the Massachusetts statute confining the banks to the use of said plates; and to form a new company with some persons from the South, skilled in engraving, as persons from the South, so skilled and acquainted with Jacob Perkins' improvements, were preparing to embark in the business, in Boston. That the reasons were urgent for immediate action, as the legislature was in session, and new plans arranging, and a great demand for the business to be done in Boston, as a more convenient place, and with increased guards against counterfeiting, by a superior style of engraving, and vignettes, and at a larger expense. But the new company was then formed—a repeal of the law prevented by this— and new plates and vignettes, in an improved style, were soon furnished. That Abraham,

being old, could not prosecute the old business alone, to advantage, if the law in that event had been left in force, and that he had no right to retain the services of Nathaniel or Morse, and was not likely to make so large profits as he would by his share, though reduced, in the new company—half of which was meant to be paid over to Angier. The new company—so as to embrace the Perkinses —it was averred, was proposed by Morse, and not by Nathaniel, when Morse had been requested to unite with him in a company to compete with the Perkinses; and that the one-third of the profits to be received by Abraham, would exceed all the gain in the old concern. That the business in Boston was the same as that in Newburyport; but many of the tools were new and better, and the style of engraving superior. That over $10,000 was expended in what was new, and that all this was necessary in order to avoid a repeal of the Massachusetts laws, and a general competition for the engraving in that state; and that this being done under the exigency of the times, Angier, on being informed of the. new arrangement, virtually ratified it.

If any other portions of the bill and answer become material to be stated, they will be given in the opinion of the court.

The evidence offered in the case, on both sides, consisted of the various documents and contracts mentioned, with several letters of the parties, and a number of depositions. When parts of these require explanation or quotation, they will be given in the opinion; but otherwise, only the conclusions from them will be stated which are clear or undisputed. There had been a reference, under bonds, between the parties in the first bill, and a report after a revocation, by the complainants. The validity of it being questioned, the respondents moved for leave to introduce it under a supplemental answer, or otherwise, hereafter, if it should become expedient, after a decision by the court on the case as it now stands; and that motion remains for future consideration.

The cause was argued in September, 1847, at an adjourned session of the May term.

English & Gardner, for complainants.
G. Minot and R. Choate, for respondents.

WOODBURY, Circuit Justice. This is one of those unfortunate family quarrels, where the conduct of the parties on both sides has probably been different between near relations, from what it would have been between strangers. Greater liberties have been taken on the one side, and more confidence reposed, and greater forbearance exercised on the other, than is usual. And yet, it is not without considerable difficulty, that, in most of the points of controversy, a line can be drawn, beyond which, in law and equity, either side has clearly passed, and cannot be justified in it. The chief parties are two brothers. One,

a man of remarkable genius in his business, and, as is often found in such cases, inattentive to pecuniary matters, and who became ambitious of exhibiting his professional distinction and powers on a wider theatre. The other, a more practical man, not desirous of change, and undistinguished as an artist, was, therefore, entrusted with the management of all the pecuniary matters of him who was about to leave their native home, probably forever. The form of arranging this business at first, was by a power of attorney. But from the embarrassments of Jacob Perkins, exposing his property to be attached by creditors and his prospect of otherwise paying them out of the liberal income, likely to be derived from his patents and improvements, in relation to bank note engraving to be defeated, the form of enabling Abraham to prosecute the business in his absence was changed, in 1819, and a lease was executed to him of all the plates, tools and other property for twenty years.

It is conceded, that from the language used, as well as the nature of the case—the rent in the lease not being a gross sum but half the net profits—the lessee was bound to carry on the business "diligently." Otherwise, no income whatever might be realized from property which the parties then valued at something like $22,500. The words of the lease, on this point, were, that the lessee will, "in some convenient place within the state of Massachusetts, diligently exercise and carry on the art, mystery," &c., of engraving "bank notes and other securities, and that after deducting the necessary expenses of the establishment," shall pay "half the remaining sums," to the lessor. Whether regarding Abraham, then, as a technical lessee of this personal property, or as agent to carry on the business, it cannot be doubted that he was to be industrious and careful, in attention to it, and pay to Jacob half the net proceeds. Furthermore, by another covenant in the lease, as well as by the nature of the case, Abraham was bound to render fair and prompt accounts of the expenses and receipts. The words used as to this, were, "will keep regular and just account-books of all the affairs and transactions of the said establishment," and allow the lessor "to inspect the said account books, and to enter and view" "the said establishment." There is no allegation in the bill, that this part of the obligation of Abraham was not duly performed, till 1833, except the not accounting and paying over in full, the half due to Jacob, till 1829, and the half due to Angier, instead of Jacob, after the assignment to the former, in 1829. A master must, therefore, be appointed, and examine the expenses and receipts by Abraham, from 1819, to February 12th, 1833, when the new company was formed, and took charge of the business under their new contract of copartnership. And should the master find that Abraham has not paid over either to Jacob or Angier what each

was entitled to receive, before that date, the balance unpaid must be decreed with interest, and against the executors of Abraham, and in favor of Jacob and Angier, severally, their respective amounts. This must be done in the first bill. The master, in forming his conclusions as to debts and credits, during this period—so remote and so obscured, as it may be in a few cases, by the lapse of time—would seem bound in some views to allow all doubts to operate against the complainants, on account of their unusual forbearance, if not neglect, to compel an adjustment of this business at an earlier period. But, considering here that it was the duty of Abraham, under his covenant, "to keep regular and just account-books of all the affairs and transactions of the said establishment," and to pay over half the net income, it would follow that if he neglected to keep such accounts, and the obscurity or difficulty grows out of that particular neglect, the presumptions in those cases of doubt are to operate rather against Abraham, whose procrastination and irregularity may appear to have caused the doubts and tended much to involve the affairs of the brothers in controversy. It looks like crassa negligentia, and under Jacob's poverty and embarrassments, can hardly be justified even if little was in reality due. Because, if so, Jacob, knowing the unpleasant truth, seasonably, other resources might have been sought by him, or expenditures not indispensable have been curtailed. The amounts, charged as expense by Abraham during this period, ought, also, to be closely scrutinized, as the wages—and especially those of Abraham's son, Nathaniel—have been charged without the sanction of Jacob or Angier to the amount, and the latter under influences of near relationship, to increase them, which were likely to mislead; and which, in fact, did cause objections and heart-burnings on the part of Angier.

But the great difficulty arises in respect to the liabilities and rights of the parties, from 1833 to the expiration of the lease in 1839. During that period, it is admitted that Abraham did not continue to conduct the business at Newburyport as before, and under his own sole guidance, and professing to pay over to Angier, the assignee of Jacob, one-half of all the net profits; but he allowed the establishment to be removed to Boston—the business to be there conducted under the direction of Nathaniel, and Morse, and Pendleton, in copartnership with himself—and he professed to account for and pay over to Angier merely one-sixth of the net income, and that, after the deduction of large salaries to the other three, in addition to expenses very much augmented. Now, whatever new arrangements Abraham might, in law, be competent to make as to the mode of conducting the business; whether by himself alone and hired persons under him, or other persons, as copartners with him, or sole lessees, it is certain, that if his personal control ceases, or is divided with others, a part of the covenant to the lessor is violated. Because by that he himself was to conduct the business, and his nephew, as well as brother, undoubtedly reposed in him, personally, a confidence which they could not be expected to extend to strangers. And though if the business was as well conducted in that way as by him alone, the actual injury would be little or nothing to Angier, the assignee of Jacob, yet the burthen of proof to show it to have been as well conducted must devolve on Abraham; and, in any points of doubt, must be decided against him.

In the next place, the lessee would have no right under the lease, as lessee, to alter the share of profits from the business to which Angier was entitled by the covenants. Litera scripta manet. The compact as drawn up must govern, and as to any new one, not authorized by Angier, he may properly say that it is not his compact—in hæc vincula non veni. If Abraham, unempowered, agreed henceforward to take one-sixth for Angier instead of one-half the net profits, the difference must be paid by himself, as the loss was caused by himself, unless his liability for it has been since waived. In this case, three justifications are set up by Abraham, for the changes in the manner of carrying on the business, and in the diminished share of profits allowed to Angier. One is, that the business, as carried on after 1833, may be deemed conducted by Abraham in substantial conformity to the lease and its covenants. See Smith v. Morris, 2 Brown, Ch. 311, 2 Dickens, 697; 2 Story, Eq. Jur. § 736; 9 Sim. 519; [Mechanics' Bank of Alexandria v. Lynn] 1 Pet. [26 U. S.] 383. Expenses might become necessary, and a change of residence, and style in engraving, and he might have been justified in doing all this if the change was only a formal one. If such an one was demanded by an alteration in public taste or public wants, and was likely, from its terms and conditions, to be beneficial to the lessor, it would not depart from the spirit of the contract. But in this case, several of the requisites seem not very clearly to be proved. The income of Angier from this business, after this change, almost entirely disappeared, being swallowed up by new expenses and the large salaries and two-thirds of the profits paid to others. If these could be considered a part of the necessary expenses, only flung into the form of salary and profit, yet some of the latter seem exorbitant in that view, and the conducting of the business with others jointly, rather than by himself alone, and under new articles of partnership rather than the old lease, seems to be an entire departure from the covenant and the personal confidence reposed by Jacob in Abraham, alone, and not in his partners. It was not conforming, virtually, any more than in form, to the lease. However judicious it might have been to make such alteration, under all the circumstances,—which

is much questioned by the plaintiffs,—it is a sufficient answer to it, as a question of power, that he had not the authority to do it under the stipulations in the lease. It was a change not contemplated in the words or spirit of any clause in it; and if proposed beforehand, to Jacob, in 1819, or to Angier, in 1829, would probably have been rejected by both without hesitation. That is a good test, showing it was too unlimited a trust to be reposed in any one, when involving so large amounts, and especially when the parties had themselves limited the power in writing, previously.

In respect to the other two excuses: One is a supposed overwhelming necessity that rendered a change proper, and justified Abraham, as agent of Jacob, in making it, either as lessee or by the force of the power of attorney, in 1817. And the other is a subsequent assent by Angier, to it, in such a manner as to amount to a subsequent ratification. In relation to the first, it is certain that a mere lessee has no warrant to alter the terms of the lease, or the amount of rent, by any circumstances considered as an overwhelming necessity. What he contracts to pay unconditionally, he must fulfill absolutely. See Weston v. Minot [Case No. 17,453]. When the rent is a gross sum, it must be paid even if the leasehold property is destroyed by fire; provided there is no exception in the lease, and no covenant by the lessor to repair. Fowler v. Bott, 6 Mass. 63; 16 Mass. 238; Hallett v. Wylie, 3 Johns. 44; 4 Har. & J. 564; 4 Taunt. 45; 7 Scott, 537; 1 Durn. & E. [1 Term R.] 310. But much more, if the property remains good, as here, and is used, half of the net profit of that use must, as stipulated, be accounted for. But how is it in the other respect? Considered as an agent of Jacob, under the power of attorney, of 1817, Abraham's authority over this property would be much larger than that derived from the lease. As an agent, cases certainly exist of an implied power to sell, hypothecate, &c., under what is termed an "overwhelming necessity." Some of this description may be seen in Story, Ag. §§ 237, 118, 192, and Story, Bailm. § 455; and they are common in mercantile law, in respect to the acts of captains abroad, in hypothecating and selling. 13 Pick. 543; 4 Car. & P. 276; Joy v. Allen [Case No. 7,552], and precedents there cited. Sometimes a moral necessity is enough to justify a change by a mere agent. 4 Car. & P. 276. But, as agent to Jacob, under the instrument of 1817, Abraham had some express authority—almost unlimited—beside what might, in an exigency, be implied. That power of attorney authorized him very broadly, for Jacob; "for me, and in my name, to perform all and every act and acts which he may deem expedient in any business, in which I have been, am now, or may hereafter be engaged," &c., &c. Now, though this was in 1817, and afterwards in 1819, the lease made a specific dis-

posal of most of Jacob's property, by leasing it to Abraham, and pro tanto, so far as others had become interested in it, placed it out of the reach of this power of attorney (Story, Ag. § 395; Allen v. Ogden [Case No. 233]), yet all the rights which still remained in Jacob, and all his property and business at Newburyport, were open to the interference of Abraham, under this standing and remaining power of attorney. Jacob needed his assistance and discretion to act for him for some purposes, in respect to them, in his absence, as much as he had before the lease. By this power, then, if Jacob had continued interested in the lease, as lessee, up to 1833, I entertain little doubt, Abraham might, in an emergency, as his attorney, have changed the place of business, and even the partners, and the shares of profits reserved in the lease. But it will be remembered, that Jacob had, in 1833, ceased to possess any interest in this matter, as all the lease and leasehold property had before that been assigned to Angier, as early as 1829, and Abraham at once notified of the fact. Thenceforward, therefore, he had no power to act in relation to them, under the instrument of 1817, as Jacob's interest had ceased, and Angier had given to Abraham nothing of the kind. Abraham, in 1833, had only the authority over what was then Angier's estate, which he possessed under the lease of 1819, as lessee, with the covenants before referred to; and that, we have seen, did not enable him, in law, to do what he attempted. The other, and last justification remains, which rests on the supposed assent, by Angier, to the change. This, in my view, is made out to a certain extent. It is true, that no formal nor express assent is proved. There was also much dissatisfaction expressed by Angier, as to the change; and he cannot, from all the evidence, be considered as yielding his assent in the end, to anything, as regards Abraham, except the terms and representations made to him by Abraham and Nathaniel, in connection with the articles of partnership. Proposing to him to fall off from half the large profits of a lucrative business to one-sixth, and that when it had been in the full career of success, and banks were multiplying by hundreds over the country, and being unwarned and unalarmed till the blow was struck, must at first have been a severe shock; and tempted him strongly to repudiate the whole transaction. Nothing but the numerous reasons for it, urged by Abraham and Nathaniel, and an unwilling belief in their correctness, could have prevented a decided denial, at once. But on their representations and terms, deeming the case hopeless for any better terms after the threatened desertion of Nathaniel; he, on these terms and representations, however hard and unexpected, probably did acquiesce in the business going on in the new form and under the new conditions. But doing this so reluctantly, and after many statements to

him by Abraham and Nathaniel, his assent must be presumed to have been given as between him and them, to the terms and constructions they had exhibited to him as to what was to be understood, between them, to be the amount he was to receive.

The whole evidence is not very clear even to this extent and with these limitations. Such of his letters written about that time, as are produced, express much dissatisfaction and no assent to any terms. The alleged letter of September, 1833, in which a subsequent ratification on some terms is supposed to have existed, is not produced. A part of another of his letters about that time is missing, and both have been in the possession of Abraham, if not of his executors. If the assent was to be inferred from the missing letter alone, and its non-production stood as poorly accounted for as it now is, a strong inference would arise that this letter had been suppressed by some person interested to do it, and the inference in odium spoliatorum would be very violent. But, the assent is more clearly shown by subsequent letters and conduct of Angier, than any particular proof which has been made of the contents or disposition of that letter. It is obvious that some assent was likely to have been contained in some letter, judging from the fact that he had been specially informed that the contract was only for a year, and yet it was not in truth terminated at the end of it, in consequence of any dissent by Angier, as it probably would have been had this dissent been expressed. So, judging from the tone of his subsequent letters, he must have acquiesced, none of them speaking of any dissent, but rather looking to the new business at Boston as a source of some expected income. This apparent acquiescence continued for years. He also actually received some money afterwards, which probably came from the new company. This, in case of an ordinary lease, would waive a forfeiture and virtually ratify or assent to any objectionable act done by the lessee, which, like this, was known to the lessor. 2 Coke, 65b; 4 Bac. Abr. "Leases," T; 2 Durn. & E. [2 Term R.] 431; Co. Litt. 215; Plow. 131; Cro. Eliz. 220; 3 Cow. 220; Bleecker v. Smith, 13 Wend. 530. Even his protest in 1840, speaks against any "previous" assent rather than any assent whatever. The suggestion that some other intermediate letters from Angier, between March and July, had been received, containing important matter, perhaps in disaffirmance of the change, had been suppressed, is not, in my view, made out satisfactorily, and is repelled by Abraham's answer in July referring merely to Angier's letter in March, and none since, and replying directly to some of the language as well as ideas of the March letter. The length of time, also, during which Angier forbore, after 1833, to prosecute the lessee, or appoint an agent to look after him, or call on the new company for his property,

and also, still later, to institute any legal proceedings, disaffirming the change in 1833, operates very unfavorably on this point, under all the attendant excitement and dissatisfaction at first expressed. However amiable may have been forbearance towards relatives, and an indisposition to commence family litigation, yet the state of feeling apparent between these parties, in the correspondence, does not indicate that so long a silence and so urgent demands for further remittances of money, and bills in equity or actions so long postponed, would have been likely to have occurred, unless Angier had concluded to acquiesce in what had been done.

From all the testimony and circumstances in the case, therefore, justified by the express declaration under oath of Nathaniel, in his answer, I am inclined to think that Angier allowed the business to go on as if he had acceded to the change; that he led all concerned to act on that conclusion, and this must be deemed sufficient, when he had full information of the change, and was bound to affirm or disaffirm what was proposed. Story, Ag. § 243; [Ownings v. Hull] 9 Pet. [34 U. S.] 607; [Bell v. Cunningham] 3 Pet. [28 U. S.] 69; Loraine v. Cartwright [Case No. 8,500]; Cunningham v. Bell [Id. 3,479]; 12 Johns. 306. Nor do I perceive sufficient evidence to show clearly fraud or mistake in procuring this assent or acquiescence. It looks highly probable that there may have been some coloring and exaggeration in some of the representations, as made by Nathaniel and Abraham to induce Angier to assent to their conditions though modified, and better in some respects than the literal construction of the terms in the articles. But the evidence is contradictory how the facts really stood. It is so, for instance, as to the extent of the counterfeits, which was a leading cause assigned for the change. So as to the extent of competition likely if the law of Massachusetts was repealed. So as to the probability of an immediate repeal of that law, if a new arrangement was not at once made.

Again, though Abraham may, in acting so hastily on the matter, have been actuated by a real belief that the emergency required it, without risking time to consult with Angier, and without sending him early a copy of the agreement and a full exhibit of his old accounts and profits up to that date, yet the appearances on this are rather that his advanced age had induced him to entrust most of the business to his son Nathaniel; that the latter, as well as himself, were disappointed at Angier's unwillingness to receive Nathaniel as a partner into the old concern, and that Nathaniel, partly, at least, in order to obtain a higher compensation and become a partner in the business under the new firm, made strong representations to the father, and hastened his decision, and obtained it, on terms less favorable to Angier than the

latter had a right to expect. Nor do I think there was any designed falsification of the date of the new articles, which is imputed. The letter of Abraham was dated at Newburyport, on the 9th of February, '33, when the articles had not been signed at Boston; and hence he could not enclose a copy of them. And though Nathaniel's letter was dated at Boston, on the 13th of February, after their signature, he did not, and might not feel bound to enclose a copy, as he was not the lessee. When it was afterwards enclosed in July, Abraham does not appear to have had anything to conceal or effect by putting the date the 14th instead of the 11th of February, though Nathaniel might, if he felt there had been any obligation on him to send a copy in his letter of the 13th of February. After the lapse of so long a time as twelve or fourteen years, it is not expected that the memory of witnesses will be very exact, or the present generation be so competent to judge of the true extent and danger of the crisis, as that which was in the midst of it, and could appreciate better many circumstances now forgotten or vanished. This delay to investigate and sue, for so many years, is the fault of Angier, and the doubts incident to it are caused by him. I am inclined to think, therefore, that though the case stated to Angier was quite as strong as the truth would justify, yet after so long a time and so much conflict in the evidence, I should not feel justified in holding that actual fraud is proved in these representations by parties so respectable, or a gross mistake so clearly shown as to justify a court of equity in setting the ratification aside on either of those accounts.

But though I have come to the conclusion that actual fraud is not proved, yet it is natural that both Abraham and Nathaniel should have been anxious to procure Angier's consent, and it is manifest that they took and improved strong grounds to effect it. Accordingly, we find in the proof facts like these, adopting the change first and not consulting Angier till afterwards,—threatening to have Nathaniel leave his business at all events and having only Abraham left, then become sixty-three years of age and unskilled personally in engraving—new companies to compete with, embracing Morse, their other chief workman, as well as Nathaniel—the Massachusetts law much exposed to repeal or important modifications—the Atlantic between the lessor and the scene of action—accounts not rendered to him and embarrassment for means. All these united seem to have imposed a sort of moral duress on Angier to acquiesce, however unwillingly. They may not be sufficient among men of business, intelligent and adults, to constitute that restraint which would entirely avoid a ratification in equity. See Jenkins v. Eldredge [Case No. 7,266]; 17 Pick. 550; 1 Story, Eq. Jur. § 239; 1 Greenl. Ev. § 197; 2 Ball & B. 304; 14 Ves. 91. But, certainly, they furnish, under such peculiarities strong reasons for holding Abraham to account to him fully for all after 1833, which was, in any way, held out by him or his son Nathaniel, with his knowledge, as intended for Angier to receive. It would not be thus had he obtained a copy of the articles and without any explanations or constructions adopted them. Then, of course, he must have been bound by the whole of them in their obvious and natural meaning, and hence he is now, probably, so far as respects the partners in the new company, who did not communicate with him and had with him no previous arrangements in business, bound to that extent. 2 Vt. 351; 2 Johns. Ch. 441; Story, Ag. § 250.

But the question here is, when those who had previous engagements with him in business proposed modifications of them, and under certain written explanations and constructions, whether they must not conform to these, and carry them into effect as understood and represented between them? Clearly they must. What then did Angier thus assent to, and what was he proposed by Abraham to receive? It is highly probable, as well as equitable, to suppose that his assent was given, so far as regards Abraham, to the construction of the articles and the additions. if any, as between them, which the letters and other evidence disclose. (1) According to these he was to have not only half the technical profits reserved to Abraham expressly in the new partnership, which was one-sixth of the whole and one-half of the twenty-five per cent. expressly reserved for what was received for printing notes on the old plates; but one-half the one-sixth of the profits given to Nathaniel, it being expressly stated to him that such was the understanding, as he had not assented to Nathaniel's being a partner, and the whole Perkins property and improvements were considered as entitled to one-third of the whole profits. Nor is this illiberal to Nathaniel, who substantially united in giving this view, and whose large salary at $1,000 per year would seem to be an ample compensation as between these parties for his services, and much more than Angier had been willing at any former period to allow to him. (2) Beside this, the $500 salary to Abraham, considering his situation as lessee and his obligation to pay half of all received by him from the business, should go, and was doubtless understood to go, in equal shares to Angier, under the original lease, and the representations made by Abraham and Nathaniel, on which Angier allowed the business to proceed in the new form. Whether in this way Angier was likely to receive less or more than he would, had the old business been continued under the risk of the Massachusetts law being repealed and under the counterfeits which existed, and the new and improved style of plates, likely to be introduced in competition. it is impossible now to decide. One party thinks the income to Angier would have

been less, looking to the impression that counterfeits were numerous, public confidence in stereotype plates much impaired, a demand arising for a more showy as well as safer style of engraving, by having special plates for each denomination of bills for each bank, and a strong probability of a repeal of the Massachusetts law.

The other party, less anxious for any change, less in the midst of the agitation, less impressible, less intimidated, less inclined to magnify new and vague dangers, thinks the reverse. But if we could, there is no necessity we should settle this moot point between them; because, coming to the conclusion that Angier did subsequently assent to new terms and new conditions connected with the lease, he is bound by them, whether they proved on trial to be in fact less profitable than the business would otherwise have been or not. The master must go into this examination closely, and, in all doubtful items, where the person chargeable has not kept good accounts, nor transmitted them punctually when requested, should incline against him. In all the subsequent modifications of the articles of partnership, lessening Abraham's salary or share in the profits, or the receipts for using the plates, Angier is not to be affected, in respect to Abraham, where there was no notice of the change nor any assent to it. None is pretended, after the first agreement and assent in 1833.

Finally, then, Angier is to receive of Abraham, yearly, till 1839, what was understood and arranged in 1833, to the extent just decided. Nor is this sum to be affected and diminished by any share of profits afterwards allowed to new partners, like Cary and Balch, of whom Angier knew nothing and to whom he never assented. He is entitled to interest on all this from the time due, when the sum has not been paid over. In 1839, when the twenty years expired, Angier was likewise entitled to all the leased property which remained, and consequently must recover of Abraham its value then and interest on it since. He also owns all the additions, made to those tools by Abraham with the earnings, and charged to expenses, or made by the labor of those then in his employ, before 1833, if any of the tools remained not worn out in 1839. Beside this, there is an interest in the new tools, new plates, and machinery of the company, which belongs to Angier. These tools, plates, &c., were bought, in part, by the funds of the assignee, entitled, as a partner in the new company, to one-half of one-third of the income in the new company, so far as regards Nathaniel and Abraham. Angier is to receive one-half of one-third the value of those plates and tools in 1839. The interests of Angier in the firm then ended, by the death of Abraham, his lessee, and the limitations of the lease. The firm, who have kept all these new tools, are liable to Angier for his share

of one-third of their value, they having to that extent, been purchased by the funds and earnings of all, and of the joint exertions of all, and by the use of the plates and old tools belonging to Angier. He, by his representative in the new company to the extent of one-third, seems entitled, when retiring from it by the end of the lease and the death of that representative, to receive half the value of one-third of the new plates, tools and materials then retained by the company, and interest on them since.

This last item will constitute the basis of a decree against these parties in the second bill, and against their share of the partnership property. It being a partnership debt, those who are parties in this bill must now be made to help to discharge the amount, due to Angier, if not able to be collected out of their property in the firm. The respondents may thus hereafter be held responsible in their private property, severally, for any balance, in a ratio with their respective interests. But their liability for it in solido, or that of the partnership property in solido, is not now decided. Going thus far seems fair and equitable as regards the firm, when they have got their large salaries yearly, a share in the profits, and the whole of the new tools and plates and materials, and a retiring partner only asks to be paid out of these latter the share he and his means have contributed towards them. There is no decree in this case in favor of Abraham and his executors against the new company, for the other one-sixth of the value of these articles, as none is asked by interpleader, or otherwise. Nor is there any against Pendleton and his share, as he is not a party to the present bill. It is gratifying to discover this means of giving to Angier some substitute for the larger income he expected, and was induced by others to expect, but failed to receive during the first years of the new company. Much of the earnings then doubtless went to purchase those new tools and materials. The large salaries paid out and which lessened the profits, went to pay for services and skill in making new and improved plates, and now, on an adjustment of the partnership concern at the end of six years, the remaining partners can, neither in law nor equity, refuse to account to one withdrawing, for his share in those new plates, materials and tools, whether bought with the partnership funds or made by the skill and labor of the partners themselves and their workmen. So the notes and accounts then due in 1839 to the company, belong one-third to Angier and Abraham, in equal proportions, and one-sixth must be accounted for to Angier by the company.

It will be seen, that, as to these items of new tools, materials, plates and notes, and accounts due in 1839, I have spoken as if Abraham, in respect to the company, then remained entitled to one-third. But if his share, by subsequent arrangements, had, by

his consent, become less, Angier may still have a decree against the company for one-sixth, if Abraham retained as large a share, and if not, to the extent of his share remaining in 1839, and for the residue a separate decree against Abraham's executors. If a portion of the materials and tools which were owned by Jacob in 1819, or had been afterwards purchased by the earnings or funds of Jacob, and were then, in 1833, delivered to the new company, and used by them, were never returned, that company should be held accountable to Angier for the whole value of what was thus situated and belonged to Jacob at first, or had been afterwards purchased by the funds earned before 1833. Their amount and interest should constitute another item of charge against the new company.

Much has been said in the argument for Angier, as to the good will of the old establishment for engraving notes, and which was transferred to the new company and should be paid for them. The complainants contend, it existed with the business and skill of Jacob and Abraham, and could be recognized in equity and pass with that business. Story Partn. §§ 99, 100; 3 Mer. 441; 5 Russ. 29; 1 Hare, 253; Smith, Merc. Law, 109, note; England v. Downs, 6 Beav. 269; 8 Paige. 75; 17 Ves. 336; 1 Hoff. Ch. 68; Story, Partn. § 99; 5 Ves. 539; 2 Keen, 219; Taylor v. Carpenter [Case No. 13,784]. The respondents argue, that the good will, which is recognized as possessing value, and subject to be paid for, when transferred, belongs only to a particular place or stand for business, and not to business itself, transacted elsewhere. Story, Partn. § 99; 16 Am. Jur. 87. But it seems to me, that whichever of these is the true view, the plaintiff, Angier, by continuing in the business at the new place, and under the new company, and receiving a share in the profits of it, obtained for the good will all he was entitled to. That is, he received all he agreed to ask for it, by assenting afterwards to take a share in the profits of the business under the new firm; and which profits and share were, doubtless, much enhanced in value by the Perkinses still being partners in the business, and their kind of plates protected in Massachusetts, by its special law, till 1836, and rendered more popular elsewhere by that protection. At the end of the interest of the Perkinses, (Angier and Abraham,) in the business, if they did not choose to continue it, either in the firm or by themselves, they cannot claim for any future good will which they thus voluntarily renounced.

Considerable attention has been, also, bestowed in the argument on the question, whether the plates, tools, &c., were not trust property in the hands of Abraham; and if so, and this was known to the new company, and they took and used them, knowing the trust which existed concerning them, whether they were not responsible for the trust thenceforward. But it is very questionable whether any trust existed here beyond what exists in all contracts. Certainly none beyond what happens between lessee and lessor, when the former is to account for half the proceeds of the use of the property, and not pay a gross rent, at all events. In such case, a sub-lessee, or an assignee, with notice, would, undoubtedly, be liable to fulfill the original agreement, if no new or different contract was made by the parties and confirmed by the lessor. Story. Eq. Jur. §§ 1231, 395, 323; 1 Ves. Jr. 477; 1 Ball & B. 52; 1 Turn. & R. 469; 2 Vern. 421, 271; 1 Vern. 365; 20 Johns. 421; 2 Dru. & War. 31; 2 Ves. Sr. 498; 1 Schoales & L. 262; 1 Johns. Ch. 305. Here was express notice of Angier's rights to, or in Nathaniel, and probably in Morse, as well as Abraham; and enough, probably to put all on inquiry. That suffices. 16 Ves. 249; 3 Mer. 704; 5 Price, 306; 2 Ball & B. 290, 416; Story, Eq. Jur. §§ 400, 1257; Jenkins v. Eldredge [Case No. 7,266]. Even a common lease, once made and assigned, or transferred, by the lessee, binds all taking it to the terms of the lease. 3 Pa. St. 16, 461; 8 Wend. 175; 5 Cow. 123; McMurphy v. Minot, 4 N. H. 251; 4 Bligh (N. S.) 380; 3 Beav. 373. But there being a new and special agreement here, subsequently ratified by the lessor, I think the new company would not be liable to do more than that agreement stipulated on their part. So far they probably are liable in aid of Abraham; and if his estate is insufficient for what is payable by it, after 1833, those of the company here prosecuted would be subject to a decree in aid of him to the extent of their liability to him, under the articles and the ordinary construction of them, if his estate be so much in arrears. But, of course, they cannot be held beyond that, as assignees from the lessee of the residue of the lease, modified according to the new articles as respects Angier, and assented to by him.

It ought to be added, before closing, that we think sufficient ground exists in equity to charge all these parties, without turning them over to an action at law. To be sure, an action would lie on Abraham's covenants against his executors, and against the partners, for the old tools and materials of Jacob, which they have not accounted for. But either of these would be very inadequate to the nature of this case—both a discovery of various parts being wanted, and a full account from all the parties, where an obligation existed to keep and render accounts, where a partnership existed for a time, and where the transactions in detail, most especially the expenses and receipts, were, in their nature, known only to some of the respondents. These are all grounds for jurisdiction in chancery. Nor was there a sufficient and ample remedy at law alone, which is necessary, even here, to oust jurisdiction in chancery. See the cases alluded to in Pierpont v. Fowle [Case No. 11,152].

Let this case, then, be referred to a master, to ascertain any sums which may be due

either from Abraham's estate or the new firm, on these principles, and how much for Jacob, and how much for Angier, from Abraham's estate; and reporting the amount due from the new company, for new tools, plates, materials, notes and accounts. The final decrees can then be entered up without difficulty, unless some further question arises as to proportions and separate liabilities, on which a further hearing may be proper. I do not see that there can be any decree in favor of Jacob. in the second bill, as he does not appear in any view to possess any claim against the new parties there, having assigned all his interest to Angier before the new company was formed. But with this exception, the other parties, in both the first and second bill, seem properly introduced.